DENA AND OLE A. R. WYATT v. ELLEN C. WYETT AND ANOTHER.[1]

May 28, 1937.

No. 31,181.

---

[1]Reported in 273 N. W. 600.

*Cobb, Hoke, Benson, Krause & Faegre, Paul J. McGough,* and *Wright W. Brooks,* for appellants.

*Ryan, Ryan & Ryan,* for respondents.

LORING, JUSTICE.

This was an action for damages for personal injuries resulting from an automobile collision. Plaintiff Dena Wyatt was riding in the cab of a truck, in the city of Brainerd, when it was struck in the rear by a car owned by the defendant Ellen C. Wyett and driven by her son. Ole A. R. Wyatt, the husband of Dena, also brought an action for medical expenses and loss of services. The two cases were consolidated for trial, but for convenience we will hereafter refer to Dena Wyatt as the plaintiff. Defendants admitted liability, and the amount of damages was the sole issue at the trial. A jury returned a verdict of $8,000 for plaintiff and $500 for her husband. The present appeal is from orders denying defendants' motions for new trial in both cases. The principal contention on this appeal is that the verdict for Dena is excessive.

Plaintiff claims that she suffered a partial dislocation of the second cervical vertebra and fractures of the odontoid process and the right lamina of that vertebra and as a result of the callous formed in the healing process and of the dislocation she now has a neuritis of the neck with a 75 per cent limitation of the motion of the neck.

Immediately after the accident plaintiff showed no apparent signs of serious injury. The injury alleged here is most often sustained by one diving into shallow water and striking his head upon a rock or in cases of capital punishment when a man is hanged. When the truck in which plaintiff was riding was struck in the rear by defendants' car plaintiff's head was thrown violently back against the steel cab. Males, the driver of the truck, and plaintiff immediately got out of the truck, walked back 200 or 300 feet to where Freerkson, who had been riding upon the back of the truck, was lying on the pavement and for some time—15 to 30 minutes—stood around the scene of the accident. Plaintiff and Males then returned to the truck and drove to the hospital to see

Freerkson. Plaintiff received no medical attention at the hospital. With Males and her husband, plaintiff then drove to a garage to have the truck repaired and about two hours after the accident was driven home.

The day after the accident plaintiff experienced some discomfort and called upon Dr. Jamieson, who had X-ray films taken of her neck. Dr. Jamieson testified at the trial that these films disclosed the fractures and dislocation above alleged and that the resulting injuries were permanent and would not improve. Dr. Anderson also testified at the trial for plaintiff, and it was his opinion that the fractures and dislocation were apparent in the X-rays. From his examination of the patient and the X-rays he testified:

"I arrived at the conclusion that she had an injury to the neck, the top of the cervical spine, and that was, first, from the general physical examination, observing the patient in walking or stooping to pick up things off the floor, or talking to me, and then by the X-rays of the cervical what I believe to be fractures in these bones of the neck, that is, of the second cervical vertebra. There I observed what I believe to be a fracture of the lamina of the second cervical vertebra—the right lamina, and a crushing fracture to the odontoid process. I also observed there the unusual tipping forward, what seemed to me to be a partial dislocation of the second cervical vertebra, dislocating it forward with a probable crushing of the intervertebral cushion or disc between the second and third cervical vertebra."

Both Dr. Jamieson and Dr. Anderson are general practitioners, and although neither of them had ever before treated an injury of this particular vertebra both had had experience in diagnosing spine injuries and in reading X-rays.

The defense consisted of the testimony of five doctors, one a specialist in orthopedic diseases, two specialists in X-ray diagnosis, and two general practitioners, all men of the highest professional standing and quite obviously sincere in their opinions. All denied that the X-rays introduced by plaintiff showed any dislocation of the vertebra or fracture of the odontoid process or of the lamina.

One of defendants' doctors stated that it would be very "unusual" for a person suffering an injury of this kind to be as active as was plaintiff after the accident. Another doctor testified that such injuries are usually fatal and that it would be impossible for plaintiff to have remained active after suffering the injuries here alleged.

Dr. Jamieson admitted that the films upon which he based his diagnosis were taken for the purpose of ascertaining whether there had been an injury to the skull and that the cervical vertebra was shown incidentally in the X-ray. For these films the patient was placed face down on the X-ray table and the head turned to one side. Defendants' experts assert that what Dr. Jamieson and Dr. Anderson interpreted as a dislocation was the position of the bone due to this twisting of the head and that the features of the X-ray films which they testified indicated fractures were shadows due to the position from which the X-rays were taken.

The controversy resolves itself into an interpretation of but three X-rays, plaintiff's exhibits E, F, and J. Plaintiff's doctors admit that on the other films the fractures and dislocation do not appear. Exhibits E and F were companion films made to be viewed through a stereoscope. Dr. Jamieson said that although the fractures show on exhibit J the dislocation is not clear. Both doctors for plaintiff maintain that the fractures and dislocation are clearly visible on E and F. In rebuttal Dr. Jamieson stated that it is quite possible for one X-ray to show a fracture and another of the same locality to fail to reveal it. It seems to be generally agreed that a lateral picture—one taken from the side of the head and neck to the opposite side—is the most satisfactory in revealing fractures like the one here alleged. Exhibit J is the closest to a true lateral of the three exhibits named. Exhibit I was also a true lateral but did not show the fracture.

We are therefore confronted with a difference of opinion as to the interpretation of the X-rays, about which it is difficult for a layman to understand why experts should disagree.

The reception of expert opinion evidence is an exception to the general rule that opinions of a witness are inadmissible. Such an

exception exists in order to assist a jury in arriving at the truth, and such evidence is admissible whenever the subject matter of the inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance. See 3 Jones, Ev. (2 ed.) pp. 2400, 2401, 2402. To say that expert opinion is admissible only because lay minds cannot form a correct judgment of the subject because of ignorance, and then to expect the same lay minds which the expert testimony is to assist to determine a highly technical, controversial question involving that subject, each side of the controversy militantly supported by well qualified experts, seems to us an absurdity. For a general discussion of expert opinion evidence, see note to Hull v. City of St. Louis, 42 L. R. A. 753, et seq.

The cases are in confusion as to the weight to be given expert opinion testimony, and the subject is well annotated in 3 Jones, Ev. (2 ed.) p. 2509, et seq. This court has repeatedly expressed its distrust of expert opinion evidence. 2 Dunnell, Minn. Dig. (2 ed.) § 3324, and cases cited in note 31. The rule seems to be that opinion evidence should not be accepted unless consistent with reason and common sense as applied to the situation presented. Bucher v. Wisconsin Cent. Ry. Co. 139 Wis. 597, 120 N. W. 518, 521. For a general discussion of the cases supporting this doctrine, see note f. to Hull v. City of St. Louis, 42 L. R. A. 753, at p. 762. Tested by that rule this is a borderline case. Much doubt is cast upon plaintiff's theory by her conduct immediately after the injury. We would have been much less reluctant to hold that there is evidence to sustain the verdict if plaintiff had caused X-rays to be taken nearer to the time of trial or if exhibits E and F had been taken from positions generally accepted as standard.

From the record, however, the plaintiff's doctors appear to be sincere, and their opinions are not so inconsistent with reason and common sense as to justify us in rejecting them altogether and in holding that the verdict is unsupported.

If the injuries and limitation of motion were as stated by plaintiff's doctors, we do not regard the verdict as excessive.

The charges of misconduct against plaintiff's counsel we do not think of such a serious nature as to require reversal even in a case so close as was this. They were of such a character that the trial court was in a much better position than are we to determine whether they were prejudicial.

The orders appealed from are affirmed.