**Patricia Ludowese RAY, Respondent,**

v.

**MILLER MEESTER ADVERTISING, INC., Appellant,**

**Robert V. Miller, Defendant.**

**No. C3–02–1605.**

Court of Appeals of Minnesota.

June 16, 2003.

Susan M. Coler, Teresa K. Patton, Sprenger & Lang, PLLC, Minneapolis, MN, for respondent.

Joseph W. Anthony, Mary L. Knoblauch, Anthony Ostlund & Baer, P.A., Minneapolis, MN, for appellant.

Donald H. Nichols, Nichols, Kaster & Anderson, PLLP, Minneapolis, MN, for amicus curiae National Employment Lawyers Association.

Considered and decided by RANDALL, Presiding Judge, SHUMAKER, Judge, and HUSPENI, Judge.*

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

GORDON W. SHUMAKER, Judge.

The district court simultaneously conducted a bench trial on claims of gender discrimination brought under the Minnesota Human Rights Act (MHRA) and a jury trial on claims brought under Title VII of the Civil Rights Act of 1964 (Title VII). Both the district court and the jury concluded that appellant Miller Meester Advertising, Inc. (MMA) had engaged in unlawful gender discrimination when it terminated respondent Patricia Ludowese Ray's employment and that Ray was entitled to damages under both acts.

On appeal, MMA alleges multiple errors in the district court's evidentiary rulings, jury instructions, calculation of damages, award of injunctive relief, and award of attorney fees.

## FACTS

Patricia Ludowese Ray worked as an at-will creative director for MMA. When MMA terminated her employment, Ray sued MMA and its owner, Robert V. Miller (Miller), for unlawful gender discrimination under both the state MHRA and Title VII of the federal Civil Rights Act.

MMA hired Ray in June 1996, to serve as one of four group creative directors. She was the first woman in MMA's 25–year history to hold a position in MMA's creative department above an associate-director level. She was given the same title and responsibilities as the other three creative directors.

After Ray started her job, MMA reorganized its creative department and appointed one overall creative director. This position was filled by a male, who was given 18 months to prove himself. When he failed to do so, he was not terminated but was given the position of senior manager at the same salary.

On June 9, 1998, MMA assigned Ray the position of sole creative director but did not formally announce her promotion, as it had done with her male predecessor.

During Ray's tenure, Marchio, a vice-president and director of human resources for MMA, commended her for her abilities. Ray's immediate supervisor, Robert Ruhland, never expressed dissatisfaction with Ray's management of the creative group, and there were no negative appraisals in her personnel file.

But Miller did say to Ray that her efforts to hire an art director were unsatisfactory because Ray did not know how to interview. Miller said he would teach her. Also on one occasion an employee under Ray's management complained about work assignments and Ray's decision not to move her workstation. Ray met with the employee and Marchio, and Marchio praised Ray for her handling of the situation.

On August 11, 1998, Miller told Marchio to fire Ray immediately. She did so. When Ray asked Marchio what she had done wrong, Marchio said she had done nothing wrong and it was a "Bob decision." In a termination letter, Marchio stated that the reason for Ray's termination was her "management style which created morale problems for employees," but Marchio was unable to identify specific problems. After Ray's termination, Miller hired a male to take her place.

The trial evidence was in sharp contrast. Robert Miller portrayed Ray's termination as the product of a proper business decision applied to an at-will employee. He testified about the low morale in the creative department and indicated that Ray had failed to achieve a consensus among the employees in that department. He also cited deteriorating business conditions and a pattern of employee complaints

about Ray as factors in his decision to fire her. He denied that his decision was motivated by gender discrimination.

To prove her allegations, Ray introduced evidence of her differential treatment as a woman; discriminatory comments by certain employees; the workplace "atmosphere"; complaints of sexual harassment and retaliation that occurred prior to the commencement of her employment; and an expert opinion on gender stereotyping. The district court overruled MMA's objections as to much of this evidence on the bases of hearsay, relevancy, rule 403, and foundation. These rulings, as well as certain jury instructions and damages calculations, are the principal bases of MMA's appeal.

## ISSUES

1. Did the district court abuse its discretion by admitting evidence that was improper lay-opinion testimony, irrelevant, unduly prejudicial, or improper expert opinion?

2. Did the admission of inadmissible evidence result in prejudicial error in the Title VII jury trial?

3. Did the admission of inadmissible evidence result in prejudicial error in the MHRA bench trial?

4. Did the district court err in its order for damages when it applied the MHRA multiplier to the front-pay damages; allowed allocation of damages between the MHRA and Title VII claims, awarded injunctive relief and punitive damages; and, was the district court's order awarding damages and attorney fees excessive?

## ANALYSIS

### I. *Evidentiary Issues*

■ The district court has discretion to admit or exclude evidence, and its rul-

ings will not be reversed unless they constitute an abuse of discretion or are based on an erroneous view of the law. *TMG Life Ins. Co. v. County of Goodhue*, 540 N.W.2d 848, 851 (Minn.1995). Even if an evidentiary ruling is erroneous, it will not be reversed unless it resulted in prejudice. *Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 46 (Minn.1997). An evidentiary error is prejudicial if it might reasonably be said to have changed the result of the trial. *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 725 (Minn.1983); *see State v. Bolte*, 530 N.W.2d 191, 198 (Minn. 1995) (providing that an error in admitting evidence is prejudicial "if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the evidence had not been admitted") (quotation omitted).

#### a. *Opinion Testimony*

The first category of testimony we will consider consists of evidence of discriminatory statements and characterizations of the workplace atmosphere during Ray's tenure.

■ Ray's husband testified that on the day before Ray's termination MMA employee Mike Butler told him that the "boys" were giving Ray a hard time and were out to get her. The Minnesota Rules of Evidence provide that a lay witness may testify only to matters about which the witness has firsthand knowledge. Minn. R. Evid. 602. With some exceptions that do not apply here, a lay witness may not testify in the form of opinions or inferences. Minn. R. Evid. 701. Butler's statements did not relate perceived facts but rather disclosed his opinions or inferences as to the "boys' " conduct. This evidence was inadmissible.

■ Employee Alexia Bonnici testified that there was a "boys' club" atmosphere in MMA's creative department and that

Marchio agreed with her. Bonnici's characterization of the atmosphere in the creative department was an inadmissible opinion, and her testimony that Marchio agreed was an improper opinion and inadmissible hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Minn. R. Evid. 801(c). Subject to exceptions, none applying here, hearsay is not admissible in evidence. Minn. R. Evid. 802. Bonnici's opinion that Marchio agreed that there was a "boys' club" atmosphere at MMA was offered to prove that there was in fact such an atmosphere. This was inadmissible hearsay.

■ Ray testified that, on the evening of her termination, she spoke with MMA employee Nancy Johnson, who told her that employee Paul Durham must have influenced Miller's termination decision because Durham has an intense dislike for women. Johnson's opinion was inadmissible, was speculative, and was allowed into evidence through the vehicle of inadmissible hearsay.

Johnson also told Ray's husband that certain employees wanted a particular male to be the creative director because they preferred someone who would sit around, put his feet up on the desk, and drink coffee with the others, and that Ray was all about the work. Johnson's testimony was an inadmissible opinion.

■ Despite the inadmissibility of these improper opinions and inferences, MMA failed to object and, therefore, waived the evidentiary error. Minn. R. Evid. 103; *Hendrickson v. Bannitz*, 194 Minn. 528, 530, 261 N.W. 189, 191 (1935).

b. *Relevancy, Prejudice*

The second category of testimony on which we focus relates to evidence of alleged sexual harassment and retaliation against MMA's female employees, all of which occurred before Ray started her employment with the company. MMA did object to this evidence.

The jury heard several former MMA employees testify to alleged acts of sexual harassment committed by male management-level personnel against female employees, generally during the years 1991 through 1995. The alleged harassment consisted of both statements and physical contact. Ray also presented evidence that MMA did not respond to complaints of sexual harassment and even sometimes retaliated against the complainants.

MMA contends that this evidence, consisting of unproved allegations of conduct that predated Ray's job commencement, was irrelevant and was also excludable under Minn. R. Evid. 403, 404, and 408. MMA argues that such evidence was inflammatory and sufficiently prejudicial to taint the outcome of the trial.

Ray argues that the evidence was admissible to support her claim for punitive damages and to show that similarly situated males were treated more favorably than she was treated.

■ Although this evidence might arguably be relevant to the punitive damages claim, it was excludable under rules 403 and 404(b), and therefore should not have been admitted as evidence in Ray's case-in-chief. Rule 403 permits the exclusion of even relevant evidence if its likely prejudicial effect will substantially outweigh its probative value. Several aspects of this evidence cause us to conclude that it cannot survive rule 403 scrutiny. The evidence (1) involved only alleged and not proved improper conduct; (2) pertained to sexual harassment, a type of conduct not at issue here and more volatile and inflammatory than an unfair employment termination based on gender; (3) involved

references to sexual harassment, and the references were not isolated or minimal but were presented through nine witnesses and, thus, became a clearly emphasized part of the trial; (4) involved alleged sexual harassment that occurred before Ray began working at MMA, and some of it had taken place as long as seven years previously; and (5) showed that all but one of the males about whom the complaints were made had left MMA before Ray began working there.

Although Ray argues that this evidence shows how MMA typically responded to complaints of discrimination against female employees, we conclude that these unsubstantiated allegations of sexual harassment, some occurring at times remote from those involved here, had relatively low probative value in this controversy, but did have a high likelihood of prejudice to MMA. Thus, this evidence should have been excluded under rule 403, and the district court abused its discretion by allowing the evidence.

We also hold that this evidence violated rule 404(b) prohibiting the introduction of character evidence to prove that a party acted in conformity with a particular character trait. It appears that this evidence was offered for the precise purpose of showing that MMA had a past "character trait" of ignoring complaints of sexual harassment against female employees and that MMA continued to act "in character" in its treatment of Ray. For such purposes, the evidence was inadmissible under rule 404(b).

■ Rule 404(b) provides that character-type evidence may be admissible for a relevant purpose other than showing conduct in conformity with a party's character trait to show, for example, a plan or a pattern. Arguably, Ray's evidence of prior sexual-harassment complaints and alleged retaliation could be admissible to show a pattern or plan of discriminatory conduct. But to be admissible for such other purpose, the

> [p]rior act evidence must also be proved by a preponderance of the evidence, relevant to a material issue, more probative than prejudicial, and close in time and similar in kind to the conduct at issue.

*Williams v. City of Kansas City, Mo.,* 223 F.3d 749, 755 (8th Cir.2000) (citation omitted). Prior "bad acts" evidence is limited because of the concern that the fact-finder will give misplaced and undue weight to it in deciding the issues in controversy. *State v. Spreigl,* 272 Minn. 488, 490, 139 N.W.2d 167, 169 (1965).

Ray failed to satisfy the conditions precedent to the admissibility of this character evidence for any legitimate purpose under rule 404(b). The prior "bad acts" allegations were not established by a preponderance of the evidence; they were not more probative than prejudicial; some of them were remote in time; and the conduct was not similar to that under consideration here.

Finally, as to this category of evidence, because of its marginal relevance to the claims in Ray's case-in-chief and its substantial potential for prejudice, if it is admissible evidence for the punitive-damages claim, the better practice is to bifurcate the punitive-damages portion of the trial from the case-in-chief.

### c. *Expert Testimony*

■ The third category of evidence on which we focus consists of the expert testimony of Eugene Borgida, a professor of psychology and law, who provided a "social-framework analysis" for the jury's and court's consideration on the issue of gender stereotyping.

Borgida testified that stereotypes "are the beliefs that people hold in their minds

about other people, other groups," and that "gender stereotyping really refers to the beliefs that we hold in our minds about other—about men and women." He distinguished "descriptive" stereotyping— how men and women are perceived to behave—from "prescriptive" stereotyping— how they are perceived to be expected to behave. Borgida explained that when a member of a group does not meet the particulars of prescriptive stereotyping, "there's a certain set of feelings and evaluations that kick in and that's typically what we refer to as gender prejudice." He noted that, in his opinion, "gender prejudice and gender * * * stereotyping played a role in understanding the termination of * * * Ray."

To illustrate this opinion, he cited statements some MMA employees made about Ray, such as, she did not meet management's expectations; she was responsible for low morale; she was overbearing; and she acted like a Jewish mother. He suggested that women in management positions have to perform a "real tricky juggling act" of being assertive and confident (as men are perceived to be) but also nurturing and sensitive (as women are perceived to be), and when women fail to fulfill both functions satisfactorily, they receive negative consequences.

Borgida acknowledged that the "framework" information about which he testified was based on research literature and that, although he read the pleadings, affidavits, and depositions in this case, he did not attempt to do "any type of scientific study" and then "apply that particular study to the facts of this case * * *." He admitted that he did not read the MMA employment manual policy on discrimination and did not assess or review Ray's management skills. He testified that his role was to provide the triers of fact with a framework for thinking about the facts of the case.

A qualified witness may give expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. To be admissible, expert testimony must be relevant and helpful to the trier of fact. *Goeb v. Tharaldson,* 615 N.W.2d 800, 814 (Minn.2000) (citing Minn. R. Evid. 402 and 702). More particularly, the opinions of experts are admitted when

> the subject matter of the inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance.

*Wyatt v. Wyett,* 200 Minn. 106, 110, 273 N.W. 600, 601–02 (1937). The standard of review of expert-testimony admissibility is two-pronged. *Goeb,* 615 N.W.2d at 815. The first prong, general acceptance in the relevant scientific field, is a question of law that we review de novo. *Id.* Under the second prong, expert-witness qualifications and helpfulness are reviewed under an abuse of discretion standard. *Id.*

MMA argues that Borgida's testimony failed to meet the rule 702 requirement of assisting the fact-finder and failed to qualify as admissible under the *Frye–Mack* standard. *See Frye v. United States,* 293 F. 1013 (D.C.Cir.1923); *State v. Mack,* 292 N.W.2d 764, 768–69, 772 (Minn.1980). Because we focus on the helpfulness of Borgida's testimony, our review is under an abuse of discretion standard. *Goeb,* 615 N.W.2d at 815.

The essence of Borgida's testimony was a lexical definition of "stereotyping," coupled with an opinion that women are often held to a higher standard in the workplace and are judged more harshly and negatively than men if they do not meet that standard. Information about and commentary on gender issues is so abundant

in our society that it has become a common stereotype that women receive disparate and often unfairly discriminatory treatment in the workplace. Part of the stereotype is that women might receive lower pay or fewer benefits than men for exactly the same work; that women may not be promoted at the same rate as men despite equal qualifications; that, because of their "femininity" they might not be suitable for "a man's work"; and that they are often expected to out-perform their male counterparts in order to achieve the same degree of respect and commendation as males. Gender stereotypes are the stuff of countless television situation comedies and are the focus of numerous media treatments on nearly a daily basis. It is unarguable that virtually all adults in our society know about gender stereotypes.

Borgida purported to give the fact-finders a framework for thinking about gender prejudice here so that they might, if they desired, conclude that Ray's termination was the product of gender discrimination. But this testimony was not sufficiently helpful to the fact-finders to satisfy rule 702 requirements. The fact-finders heard evidence that Ray was treated differently from creative department male employees and that some pejorative gender statements were made about her. Borgida's expert testimony is hardly the type of evidence without which laypersons are incapable of forming a correct judgment. There is nothing in this case that shows directly or inferentially some insidious scheme or pattern of gender discrimination that can be uncovered only with the help of expert analysis, such as a statistical demonstration. Rather, this case is straightforward and within the realm of ordinary understanding and comprehension. Thus, Borgida's testimony did not qualify for admission as expert testimony, and the court abused its discretion in allowing it.

## II. *Title VII Jury Trial*

At the conclusion of the trial, the jury could have reasonably concluded that MMA was a corporation that declined to take any remedial action for acts of sexual harassment by male management employees and, in fact, sometimes retaliated against women who complained of such conduct. That conclusion could be based on inflammatory, inadmissible evidence. With such evidence in mind, the jury could have determined that MMA continued with its discriminatory conduct in Ray's termination.

To bolster the inflammatory evidence, the jury heard inadmissible expert testimony that gender prejudice was a factor in Ray's firing.

Considering the quantity and character of all the inadmissible evidence in the trial, we are compelled to conclude that the jury verdict might well have been the product of or substantially influenced by that evidence. Thus, the evidence was unduly prejudicial and deprived appellant of a fair trial because it is at least arguable that the outcome might have been otherwise had only admissible evidence been presented. Therefore, we reverse the verdict in the Title VII action and remand for a new trial.

## III. *MHRA Bench Trial*

### a. *MHRA Findings and Conclusions of Law*

In a bench trial,
[f]indings of fact * * * shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Minn. R. Civ. P. 52.01. In considering a claim of insufficient evidence, an appellate court's review is limited to a thorough

analysis of the record to determine whether the evidence, when viewed in the light most favorable to the verdict, is sufficient to allow the fact finder to reach the verdict that it did. *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989).

■ Gender discrimination claims under the MHRA are analyzed under the McDonnell–Douglas burden-shifting analysis. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 444 (Minn.1983).

■ The McDonnell–Douglas analysis involves a three-step process. First, an employee must demonstrate a prima facie case of reprisal by a preponderance of the evidence. *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101–02 (Minn. 1999). To establish a prima facie case of reprisal, an employee must show (1) that he or she engaged in statutorily protected conduct; (2) that the employer took adverse action; and (3) that a causal connection exists between the employee's conduct and the employer's action. *Hubbard,* 330 N.W.2d at 444. If the employee establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision. *Id.* at 445. Finally, if the employer meets its burden, the employee must prove by a preponderance of the evidence that the legitimate reason offered by the employer was a mere pretext for reprisal. *Id.* Proof of discrimination may be shown by direct evidence of discriminatory motive, such as where an employer announces he will not consider females for positions. *Sigurdson v. Isanti County,* 386 N.W.2d 715 (Minn. 1986) (citation omitted). In the alternative, where direct evidence is not available a plaintiff may show discrimination by indirect means. *Id.*

In its thorough and lucid findings of fact, the district court determined that Ray is a member of a protected class; that she established a prima facie case of gender discrimination; that MMA presented evidence of legitimate, nondiscriminatory reasons for Ray's termination; that MMA's reasons were pretextual; and that MMA committed unlawful gender discrimination in violation of MHRA when it terminated Ray.

This case clearly turned on a resolution of the credibility of the witnesses. The district court found that MMA's proffered reasons for Ray's termination were not credible and were "assembled" to justify the firing:

> particularly the testimony of Robert V. Miller raise not just a "suspicion" of mendacity, but rather, a firm belief that defendants have not been truthful with Ray or with the court about its reasons for terminating her and that the real reason for her termination was discrimination.

(Emphasis omitted).

The court ruled that because Ray proved a prima facie case of discrimination and because MMA's reasons for her termination were false and pretextual, Ray established her claim of intentional and unlawful gender discrimination.

Because of the court's credibility assessments, its findings of fact are supported by the evidence and are not clearly erroneous. Thus, we affirm the district court's holding that MMA violated the MHRA by wrongfully terminating Ray's employment because of her gender.

### b. *Different Outcomes of the Claims*

■ Although a cursory reading of our holdings might suggest inconsistency, because we have reversed the jury verdict but have affirmed the district court's ruling, there are pivotal reasons for the differing outcomes. This was a close case, one that depended almost entirely on the

credibility of the witnesses. We are aware from the district court's detailed findings of fact that, although the district court noted the inadmissible "bad acts" evidence and expert testimony, it did not significantly rely on it in reaching its conclusions. Rather, the district court completely discounted MMA's reasons for Ray's termination and was left with no plausible conclusion other than unlawful discrimination. Thus, we became privy to the district court's thought process through the court's careful and thorough findings and are able to ascertain the basis for the court's decision.

We had no such luxury with the jury. Although there was admissible evidence upon which the jury could have reached the same conclusion as the district court, we do not know whether the jury relied upon that evidence or what role, if any, the inadmissible evidence played in the jury's verdict. Untainted by the inflammatory, inadmissible evidence, the jury would have had before it the same untainted evidence that the district court revealed in its findings that it considered and relied upon. That untainted evidence consisted of prima facie proof of discrimination and ostensibly legitimate business reasons that would negate that proof. The case would then depend on a resolution of credibility issues. We cannot say that in an untainted case the jury would have believed Ray and disbelieved MMA. Thus, because we cannot know whether the inflammatory, inadmissible evidence caused the jury to weigh the credibility determinations against MMA, a reversal of the jury verdict is compelled.

## IV. *Remedies*

Because we reverse as to the jury verdict, the only damage issues before us are whether the district court erred in its order for damages under the MHRA. MMA argues that the district court abused its discretion in six ways in fashioning its remedy, claiming that (a) the damages award was excessive; (b) the court should not have allowed Ray to allocate her damages award; (c) the court applied the MHRA multiplier to the front pay in error; (d) the injunctive relief was unsupported by law; (e) the award of attorney fees was excessive; and (f) the punitive damages awarded were not appropriate.

### a. *Excessive Damages Award*

 MMA contends that the compensatory and all other damages were excessive.

The discretion to grant a new trial on the ground of excessive damages rests with the trial court, whose determination will only be overturned for abuse of that discretion.

*Advanced Training Sys., Inc. v. Caswell Equip. Co., Inc.*, 352 N.W.2d 1, 11 (Minn. 1984) (citation omitted). "The trial judge has 'large discretion' in determining if damages are excessive and whether the cure is a remittitur or a new trial." *Hanson v. Chicago, Rock Island & Pac. R.R Co.*, 345 N.W.2d 736, 739 (Minn.1984) (quotations and citation omitted). But MMA does not carry its burden to show specifically how the district court abused its discretion. Here, the district court, sitting in the best position to determine what is reasonable, stated that "the award of attorney fees, costs, and damages to Ray are reasonable," and we defer to the district court's "large discretion," absent a showing of an abuse; thus, we affirm as provided the amount of the award.

### b. *Allocation of Damages*

Congress explicitly stated that nothing in Title VII was intended to relieve an employer of liability under state law. 42 U.S.C. § 2000e–7 (2000). The U.S. Supreme Court has made it clear that plain-

tiffs are entitled to pursue discrimination remedies under both Title VII and state statutes, such as the MHRA. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 48, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974) (holding that "an individual may pursue independently his rights under both Title VII and other applicable state statutes").

Here, Ray had claims under both federal and state law, but the issue as to whether Ray can recover under both MHRA and Title VII is moot because we have reversed the verdict on the Title VII claim.

### c. *MHRA Multiplier to Front Pay*

██ Application of the MHRA multiplier is vested in the district court's discretion. *See Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 274 (Minn. 1995). This issue presents the question of whether a front-pay award is an element of compensatory damages. Under Title VII, the U.S. Supreme Court has concluded that front pay is not an element of compensatory damages. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848, 121 S.Ct. 1946, 1949, 150 L.Ed.2d 62 (2001). MMA argues, in essence, that the same distinction is true under the MHRA.

██ The MHRA states in relevant part that where the trier of fact

finds that the [employer] has engaged in an unfair discriminatory practice, the [trier of fact] shall order the [employer] to pay an aggrieved party, who has suffered discrimination, compensatory damages in an amount up to three times the actual damages sustained. In all cases, the [trier of fact] may also order the [employer] to pay an aggrieved party, who has suffered discrimination, damages for mental anguish or suffering

Minn.Stat. § 363.071, subd. 2 (2002). The MHRA does not define the terms "compensatory damages" or "actual damages."

*See* Minn.Stat. § 363.01 (2002) (providing no definition for terms "compensatory" or "actual" damages). The phrase "actual damages" is generally regarded as a synonym for compensatory damages. *Phelps*, 537 N.W.2d at 275.

Minnesota appellate courts have not specifically held that front pay may be multiplied under the MHRA. Rather, this court has stated that

[t]he statute does not specifically state how a district court is to determine whether compensatory damages should be multiplied, and * * * nothing in the legislative history of the statute provides guidance on this question.

*Phelps v. Commonwealth Land Title Ins. Co.*, 520 N.W.2d 748, 752 (Minn.App.1994), *aff'd*, 537 N.W.2d 271 (Minn.1995). In affirming, the supreme court held that Minn. Stat. § 363.071, subd. 2, contains no guidelines as to when or under what circumstances a district court may multiply damages and concluded that the district court did not err in its application of the multiplier. *Phelps*, 537 N.W.2d at 278. It reasoned that courts are unambiguously vested with the discretion to multiply damages, but did not reach the question of whether front pay may be multiplied. The court said that the statute

gives a trial court the option of including back pay as a part of actual damages subject to multiplication, or merely awarding back pay attendant to the hiring, reinstatement, or upgrading of an aggrieved party

*Id.*

Clearly, the multiplier provision is subject to more than one interpretation. *See Mathieu v. Gopher News Co.*, 273 F.3d 769, 781–82 (8th Cir.2001). The *Mathieu* court stated that

[a]lthough the decision to award front pay lies within the discretion of the district court in order to make the plaintiff

whole, our only real guidance as to what the Minnesota courts might do under similar circumstances comes from the treatment of front pay in the federal courts. * * * Under these circumstances, we find little justification for a judge to multiply this discretionary award under Minnesota law without precedent or at least better guidance as to the nature of front pay.

*Id.* at 782. The *Mathieu* court remanded the award of front pay and requested the magistrate judge to amend his judgment by eliminating the multiplier as to that element of the judgment. *Id.* at 785.

■ The issue presented for review here is whether front pay is an element of compensatory damages under the MHRA, and thus is subject to the multiplier. Front pay is "simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard,* 532 U.S. at 846, 121 S.Ct. at 1948.

■ *Phelps* holds that "subdivision 2 unambiguously vests trial courts with the discretion to multiply damages." *Phelps,* 537 N.W.2d at 274. Thus, multiplication of damages may be appropriate when the plaintiff is left uncompensated by an unaugmented award of compensatory damages, such as in the case of loss of potential income or loss of potential raises.

■ Here, reinstatement was not possible; Ray was left uncompensated for the loss of potential income and raises, and it was reasonably anticipated that she would not be able to secure a comparable job in her field. Because the district court awarded front pay for a reasonable period of three years and district courts are vested with the discretion to multiply damages, front pay can be considered an element of compensation in the context of lost wages. *Phelps* suggests that front pay may be used to augment an award of compensatory damages; and Minn.Stat. § 363.071, subd. 2, allows "compensatory damages in an amount up to three times the actual damages sustained." Thus, we hold that front pay is an "actual loss" and may be trebled under the MHRA in this case. But the language of Minn.Stat. § 363.071, subd. 2, specifically does not include emotional damages within the damages permitted to be trebled. Thus, the treble of that award is reversed.

#### d. *Injunctive Relief*

■ MHRA states in relevant part that the district court

shall issue an order directing the respondent to cease and desist from the unfair discriminatory practice found to exist and to take such affirmative action as in the judgment of the [court that] will effectuate the purposes of this chapter.

Minn.Stat. § 363.071, subd 2.

The district court's order of annual employee performance evaluations does not interfere with gender-neutral management. The MHRA does require that the court's actions be necessary to prevent discrimination, and it is reasonable to conclude that annual performance evaluations are necessary to prevent unlawful discrimination. The requirement of annual performance evaluations of employees is most likely a routine practice in contemporary business and may benefit both MMA and its employees by reasonably assuring that employee discipline, transfers, promotions, terminations, and the like have permissible, objective bases. Thus, the court properly exercised its discretion to take the "affirmative action" contemplated by the MHRA as necessary to effectuate the act's purposes.

### e. *Attorney Fees*

"On review, this court will not reverse a trial court's award or denial of attorney fees absent an abuse of discretion." *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn. 1987) (citation omitted). The reasonable value of counsel's work is a question of fact and we must uphold the district court's findings on that issue unless they are clearly erroneous. *Amerman v. Lakeland Dev. Corp.*, 295 Minn. 536, 537, 203 N.W.2d 400, 400–01 (1973).

Under the relevant language of the MHRA, "reasonable attorney's fees" may be awarded. Minn.Stat. § 363.071, subd. 2. MMA argues that any fee must be determined in accordance with the lodestar method that multiplies the reasonable hourly rate times the reasonable number of hours expended. *Shepard v. City of St. Paul*, 380 N.W.2d 140, 143 (Minn.App. 1985). A reasonable rate is based on prevailing market rates in the community. *Id.*

MMA argues that the district court deviated from the basic rules and erred by allowing Ray's attorney fees to be withheld and by adopting top-of-the-market hourly rates, without any factual basis for doing so. In addition, MMA argues that the district court's discount of Ray's counsel's claimed hours by five percent was token, and without any discernible factual basis, and that the district court must specifically scrutinize the hours expended in the claim. *See Anderson v. Hunter, Keith, Marshall Co.*, 417 N.W.2d 619, 629–30 (Minn.1988) (holding that when the reasonableness of "hours expended" component is challenged, the district court should scrutinize it). The record supports the district court's award of attorney fees of $396,853.90, and thus we uphold the award.

In its 16–page memorandum in support of the award of attorney fees, the court specifically scrutinized the attorney and legal assistant hours, itemized by each individual's contribution, and determined the reasonableness of those hours. The court also specifically scrutinized historic and current fees, making adjustments as it deemed necessary to arrive at reasonable fees. Because the court properly considered the hours expended and appropriately followed the lodestar method, and because MMA fails to show how the district court abused its discretion, the award of attorney fees is affirmed.

### f. *Punitive damages*

The court awarded punitive damages and a civil penalty. MMA does not specifically challenge the civil penalty but argues that it was improper for the court to award punitive damages.

A decision on the amount of a punitive damage award lies almost exclusively within the province of the fact finder. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 259 (Minn.1980). We cannot "disturb the award on appeal unless it is so excessive as to be unreasonable." *Id.* (citation omitted). Because no constitutional issue is raised, our review of an award of punitive damages is whether there was an abuse of discretion. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433, 121 S.Ct. 1678, 1684, 149 L.Ed.2d 674 (2001).

Under the MHRA, punitive damages "may not exceed $8,500" and are "awarded under section 549.20." Minn.Stat. § 363.071, subd. 2. Minnesota law provides that punitive damages are allowed in civil actions upon clear and convincing evidence that the defendant's acts

show deliberate disregard for the rights or safety of others.

(b) A defendant has acted with deliberate disregard for the rights or safety

of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn.Stat. § 549.20, subd. 1(a)—(b)(2) (2002).

Under the MHRA, punitive damages must be proved by clear and convincing evidence. Minn.Stat. 549.20 (2002).

Here, the district court found that Ray proved

by clear and convincing evidence that MMA acted with deliberate disregard of her rights to be free of discrimination in the workplace, entitling her to an award of punitive damages under the MHRA

and that

given, among other things, this knowledge and the circumstances of Rays termination, including [MMAs] complete failure to investigate the accuracy of the alleged reasons for the misconduct,

that an award of $6,000 is appropriate, given the egregiousness of the conduct and the financial resources of MMA.

## DECISION

Because MMA does not establish how the award of $6,000 is so excessive as to be unreasonable, and given the reasoning of the district court, we hold that the court did not abuse its discretion and affirm the award of punitive damages under the MHRA.

Because we find no error in the district courts determination of liability and damages under the MHRA, we affirm.

Because we hold that the cumulative effect of inadmissible evidence in Rays ac-

tion under Title VII resulted in undue prejudice, we reverse and remand for a new trial on that claim.

**Affirmed in part, reversed in part, and remanded.**